We move to the third case this morning of Flournoy v. City of Chicago. Good morning, Your Honors. Robert Robertson on behalf of the plaintiffs. We're here following a jury trial in which the plaintiff was an elderly woman. She was asleep in her son's new apartment, at which point in time, members of the Chicago Police Department executed a not-to-be-announced search warrant. It was a 20-man paramilitary unit with an armored vehicle, all in body armor, with M4 assault rifles. The only one in the room, in that front room, was the plaintiff, Ms. Flournoy. Windows were broken, and tossed in were at least one flashbang grenade. Following that, Ms. Flournoy suffered serious injuries to her knee. At the trial, a key piece of evidence was excluded, and following that trial, all she was left with was a note, basically saying, hey, sorry about this horrible case, but we did not want to put the errors of the entire Chicago Police Department on these two officers. What we're asking... Well, that's not quite what it said, but approximate. I admit you, I didn't read it verbatim, and I didn't memorize it, but I didn't mean to The use of this force was per se unreasonable for a variety of reasons. First, you have to look at the amount of force that was used. These flashbang grenades, which are regulated by the ATF, have unique serial numbers, must be signed in and signed out, and records must be kept because they're explosive devices, burn at 2,000 degrees Celsius. That's like a third of the temperature of the floor of the sun. That's where gold becomes liquid. Those are tossed in, and one lands on Ms. Flournoy's knee. Prior to using that device, the Chicago Police Department officers in question had made no legitimate investigation as to whether there was a threat in there, had not looked into that room sufficiently to determine whether there was someone in there, whether it could have been a portion of that room that was completely blind, completely blind, they could not see into, yet that grenade went in there anyway. Whose decision was it to use that device? Each officer, the original plan had ten officers armed with grenades. It called for multiple use of grenades, and each officer had the discretion whether to deploy a grenade or not. So in this case, the evidence showed that at least Officer Quinn tossed in a grenade. It was within his discretion whether to do that or not. Well, I think you can follow up on Judge Manning's question. Who made the decision that they would go in in that type of situation, in a SWAT team situation with flashbang? Oh, the other defendant, Defendant Colbinson, designed the plan in question. He designed the paramilitary group with the use of the grenades and the breaking of the windows to create an additional distraction that would have just given these heavily armed, bodily armored individuals an additional two to eight seconds of lag time. That's the only benefit whatsoever that was to be used by this, use of this dangerous device. And considering this, I mean, it was, there was no investigation, no sufficient surveillance as to who was in the apartment. No sufficient surveillance of, hey, can we look in a mirror? Can we somehow see who is in the room? And it's a small room. It was well lit. It was a routine search warrant, I mean, for a street level dime bag dealer. In that situation, it's not like there's ISIS or a terrorist or an armed group of thugs in there. I mean, they thought that maybe the subject of the search warrant possibly had been armed and that one person could have been in there. I mean, even as a betting man, you got the 20 guys with the M4s, bodily armored, versus one guy who may be there. The use of such an explosive device, blindly. Well, this was all started by somebody meeting somebody at the door with a gun. Early on. I'm sorry? Early on at that particular apartment. The John Doe indicated that this Anthony person did have a gun on a prior occasion. But that's all there was. There was no search into who Anthony was, whether he had been armed, what his background was, whether there was any individuals of violence. And I go back to this court's decision in Jones that talked about the drug trade. Hey, guns are involved in the drug trade. That's not enough. Guns are, sometimes felons have guns. That's not enough. You know, there needs to be some type of investigation into what's going on. There needs to be some concern for human life. But these are almost all arguments you made to the jury and the jury came back and ruled against you? Absolutely. I mean, this is, it's not a great, obviously it's not a great standard here. That being said, Your Honor, if the standard were, these are all arguments made to the jury, there would be no provision for arguing that a jury's verdict was against the manifest weight of the evidence. And looking into the amount of force, the poor planning, and really the failure to explain any of this, this is the case where the jury's verdict is against the manifest weight of the evidence. I mean, this is what you get in every single case. Every guy they're going after is the worst guy in the world. Every area in the entire city is a high crime area. Every action that they take, oh, it's reasonable. What's interesting is, by their own priority of life, safety of civilians should have been number one. Counsel, that leads me to ask, there were three, I think, complaints in this case. The original complaint, and then it was amended, and then I think the Third Amendment came after mediation perhaps. And somewhere along the way, in at least one, maybe two, iterations of that complaint, there was a Monell claim, and it went away. And some of your arguments sound of a Monell claim, and so I'm just curious what happened to the Monell claim. The Monell claim was dismissed, Your Honor. In terms of what my arguments go to the Monell claim, I respectfully disagree. I think that the two defendants that were here were the officer who planned it and who broke all the windows, which would have driven Ms. Flournoy from the blind spot directly into the blast zone, and the officer who chose to toss that grenade in. And, you know, ideally, sure, you know, it would be great to sue every member of that attack team, because we don't know, actually know, how many grenades were deployed. I mean, there's no records kept, even though the ATF required it, saying how many were taken out of the raid, how many were returned. It would be great to have a Monell. It would be great to go after the sergeant. But the city defends these cases as a team. You push up, you push down, and that's the way it goes. But that's what I'm saying. I'm hearing in some respects you making an argument that the city's policy, as it were, if this is a policy, basically puts the city in a situation where any time police officers go in to execute a warrant on somebody who may be at one point had a gun, they're going to show up this way. I think I would take that back to Judge Mannion's point as to whose decision it was to deploy the grenade. It was Officer Quinn's decision, solely his. And the fact that they broke the window and then could see into the home prior to the grenade being deployed, but were too busy yelling police to actually stop the deployment of that grenade, shows the flaw in that plan. I mean, it was an accident waiting to happen. If you look at that coupled with the knock and announce, I mean, that's particularly dangerous. I mean, the idea is like, hey, we're going to knock on the door so people will come to the door, and we're going to toss their grenade in. I mean, I understand that this standard is not great for us. But looking at all of these things, and you look at this court's decision in Milan, I mean, the Milan court had half the SWAT team that this did. They did more investigation, and the court still talked about how dangerous these are and what steps the Chicago Police Department must take before using such terrific force. Beyond that, this is not a case where the jury heard all of the key evidence. And I'd like to move on to the second point and the exclusion of that report with the handwritten notation that two flashbangs were deployed. The primary problem in this case is that that exclusion of that document allowed the defendants to use this as both a sword and a shield. They excluded it primarily under the idea that the authorship could not be determined. After they did so, they all got up there, every single police officer, and testified only one grenade had been deployed. Despite the fact that there were no records, despite the fact that they were mandated to keep those records. At that point in time, the defense then called Ms. Flournoy's own family members, who were coming in from jail, who were dressed in prison garb, and who had them testify to multiple flashbangs being deployed, multiple little bombs. Impeached them with their felony convictions, of course. And then, in closing arguments, challenged the jury, if you find there's more than one flashbang deployed, then you go ahead and find. What they did was the key piece of evidence was excluded, and they ran with that further and further with impunity. That official police report had a handwritten notation on the bottom. It said, two flashbangs deployed. It was obviously with someone from knowledge of that raid. That document, that notation, must have been made either by a Chicago Police Department employee, or it was received by or from the Cook County State's Attorney's Office. But there are no hearsay exceptions that cover either of those conditions that you just raised. In fact, it was received from someone with knowledge, or received by somebody who kept the record. Those aren't hearsay exceptions. I would say, Judge, I understand. The two I primarily rely upon are the business records exception and the residual exception. That talks about the guarantees of trustworthiness. And here I think it's important to look at the relationship between the State's Attorney's Office and the Chicago Police Department. In that instance, the Chicago Police Department goes to the State's Attorney's Office for the very warrant that they seek to execute. After that warrant is executed, the Chicago Police Department works hand-in-hand with the Cook County State's Attorney's Office in order to prosecute the case. The form in question came to the plaintiff from defendants when they tendered it, after receiving it from the Cook County State's Attorney's file. There's certainly an agency-type relationship and certainly a law enforcement relationship where both parties want to work together to reach the same goal. So you're arguing then that the typed signed form is a record of regularly conducted business and therefore an exception to the hearsay rule. But what I understand you to be claiming in the brief is not that you wanted the police report in. It's that you wanted that handwritten notation in, right? We wanted both in. We wanted the police report also with the handwritten notation as either the bulk of it a business record and possibly a business record from the State's Attorney's Office as it came from them, from their file, maintained in their file, or under the residual exception it talks about the guarantees of trustworthiness considering both of these agencies were law enforcement agencies. They all concerned this. The particular type of knowledge, all these factors, gave it circumstantial evidence of trustworthiness. The statement that two flashbangs were employed, which is written by a person whom you can't identify at a time that you don't know, what are the indicia of reliability that make that admissible, that handwritten notation? Judge, I would say it's the detailed nature of it, the fact that it must have been from someone who had knowledge of the raid. It's corroborated by the civilian witnesses called by the defense, the members of the Flournoy family. It comes from a source that is reliable in the sense that it's a prosecuting agency dealing with this, an official public agency that's required to uphold the law. Those factors are the most important. It gives circumstantial guarantees of trustworthiness. I would also say on the flip side, there's certainly something that says it should go to the weight of the evidence rather than just its admissibility. I go back to the fact that the record-keeping in this case was abysmal to the point of being intentionally slip-shot. When every regulation says ATF requires you, you must sign out each one of these. You must record the serial number on each one of these. You must return them on each one of these. And the Chicago Police Department comes back and says, we got nothing. No records about how many grenades were used, whether they were turned in or turned out. And the thing is, about the lack of the author, it would be great. But you're putting it entirely in the defendant's control. That's not mine. That's not mine. And all of a sudden we can't get that in, a key piece of evidence? Interestingly, and this was argued to Judge Hart below, one of the officers, Officer Maldonado, said in his deposition that he thought that the two flashbang grenades deployed, riding, was that of his partner, Officer Quinn, one of the defendants, or Officer Colvinson, one of the defendants, or that of his partner, Officer Brown. So there was some indication with that. We should have been, oh, I'm sorry, I see my time has expired. If I could interrupt one more thing. Sure. There was one copy without any writing on it, right? Correct. Which indicates to me at least there was a clean copy from the start and another copy was subsequently written in on? Sure. I mean, the way these, especially now in days of easy duplication, there could have been six, eight, ten, fifteen copies of that. There's always one copy, but it's not that there's one official copy. Well, I know. One original. This is the problem. If it's a clean copy to start for somebody, there is, with no writing. The writing is handwritten, right? Correct. And it's not, it's indelible. It's not something you can erase or take off. I don't believe so, Judge. I haven't seen the original. The only reason I say that is because if there's an original, you say, well, you can make a lot of copies of the original and somebody can write on them. That's the problem. Because if there's an original that recites in it there was one used, then somebody writes on something else. That's when we don't know who it is. Right. Well, I agree that that could be an indication, but it could have, what we're saying is because of what's written, it had to have been someone from the raid, someone who was there. It doesn't have to be somebody who got ahold of a subsequent copy, but it could be. That's what I'm. Oh, yeah, but I mean the information. But also, even if it's the State's Attorney's Office, who got hold of a subsequent copy, that information would still have had to come from someone with knowledge of the raid that they're talking to. Is that the question, maybe the second grenade hit her? Judge, I could not answer that question. I know that there's one blast. If you look at the photos in the appendix, there's clearly one black blast site, but it must have landed directly on Ms. Flournoy's knee to cause that eight-and-a-half by nine wound that just shredded her knee. What's the matter if there were two? That would double the amount of excessive force. That would show a doubly. Is this what you said, there was some admission if there were two, there would be a different case? Is that what you were trying to say? I would say it would make our case even stronger, Judge, and it would also show that every one of these defendants came in here and deliberately lied, and it showed more of a motive to conceal things. Counsel, I just had one question. Sorry, slightly different. You said they came and your witnesses, the Flournoy family, came in prison garb, testified. Is that right? Yes, Judge. We didn't call. It was the defense that called. But that was in front of the jury? Yes. Now, according to what I'm looking at here, that motion was argued prior to opening statement. Which motion? I'm sorry, Your Honor. What you're talking about. In fact, the district court heard argument on the motion to reconsider before the trial's opening statements. Is that when the testimony came in? No, the testimony came in during trial. I'm sorry. I'm not trying to be obtuse, Judge. I don't get you on this. I'm sorry. So you're indicating to us that your witnesses were brought in in prison garb before the jury? Not our witnesses. Well, the Flournoy witnesses came in. Yes. Okay. And I think it was done to kind of seer Miss Flournoy. Well, I understand. I'm not worried about why their motive was. But I just wanted to make that clear. Okay. Thank you. Thank you so much, Your Honor. Thank you, Your Honor. May it please the court, the district court soundly exercised its discretion in denying the motion for a new trial because the verdict was not against the manifest weight of the evidence. The jury heard testimony that officers Colbinson and Quinn were tasked with executing a high-risk search warrant. Facing that dangerous situation, the officers acted reasonably in breaking two windows and deploying one flashbang grenade, or alternatively, at a minimum, they are entitled to qualified immunity. Additionally, the exclusion of the copy of Officer Colbinson's report that includes this handwritten notation does not entitle Ms. Thornoy to a new trial, and with respect to the jury's statement that it submitted with its verdict, unless the court has any questions on that subject, we rest on our briefs. But to start with the manifest weight issue, Officer Colbinson received information he knew that the suspect in this case answered the door holding a semi-automatic handgun. Based on that information, Officer LoBianco determined that that was the officer who obtained the search warrant. He determined that this search presented a high degree of risk. It was too dangerous for his officers to execute. For that reason, he sought the services of the SWAT team. Sergeants Wieberg and another sergeant, I'm sorry, his name is escaping me at the moment, reviewed that request for high-risk search warrant services. They, in their own judgment, determined that it did present a high degree of risk, and on that basis they approved the request. Counsel, given that we're in the city of Chicago, the definition that you just gave, wouldn't that render rather a significant percentage of the arrest warrant executions in this city to be high-risk situations? It's possible, Your Honor, and in terms of the broader statistics, in terms of how frequently the SWAT team is deployed to execute search warrants, those numbers aren't in this case. However, to the extent Ms. Thornoy takes issue with how often the city deploys the SWAT team to execute search warrants, that is the kind of claim that had to have been brought in a Monell claim, challenging the city's policy. By the time this case came to the two individual defendants who are in this case, Officers Colbinson and Quinn, the determination had already been made that this was, in fact, a high-risk search warrant. Then tasked with executing that warrant, Officer Colbinson devised this mission plan that authorized the use of flashbang grenades as well as the breaking of windows. And in light of all that, the dangerous situation that was determined by these officers' superiors and the facts that came into the trial that explained why the judgment was made that this presented a dangerous situation, these officers acted reasonably in executing the search warrant the way that they did. With respect to the exclusion of the handwritten, the copy of the report that includes the handwritten notation, that copy of the report is completely untrustworthy in that a version of this report was sent to the state's attorney's office approximately seven months after the search was executed. It did not include that handwritten notation, which suggests that it was added some time after that. Is that the first one that may have been sent out of there, out of the file? The first one, well, it's, what's in the record is the version that was faxed. Well, the reason is that if that's seven months afterward, it's a clean copy. Correct. That's what I was thinking about. And so I'm wondering if anything is written in, it would have to be after seven months, or would it be other people had a copy of that earlier? Your Honor, we believe that the reasonable inference would have been that this notation was added after those seven months. And certainly the district court was within its discretion in finding that way as well. Moreover, another reason why this handwritten notation is not trustworthy is that it contradicts the typed portion of the report that Officer Colvinson did in fact prepare, which says that one device was used. And one would imagine that if the author of the handwriting intended to correct that record, he or she would have crossed out the typed notation that one of these devices was used and stated clearly that in fact two were. But instead, this handwritten notation contradicts what has been typed. And for that reason, it was completely untrustworthy. Counsel, can I go back to your argument that the officer's actions here were reasonable? The description, the sense that one gets from reading the facts, both parties' sets of facts, I think. You got 20 guys in body armor with weapons and a battering ram surrounding an apartment. It sounds like there's noise going on. There are people yelling police. Somebody knocks. A couple seconds later, in goes the door. Crash goes the window. Glass going everywhere. And then this device gets thrown in. It's hard for me just imagining that scenario, to imagine that somebody who's asleep on an air mattress has time to hop up, scream, wait, wait, wait, I'm coming, I'm coming, or whatever she may have done, get to the door and open it. It seems like this grenade was going to be used regardless. Officer Quinn testified that his role in executing this warrant was to look inside the doorway and look at the place where he intended to deploy the device, which was a few feet inside the apartment, and if that was clear, if that area was clear, then he was going to deploy the device. But to go to the other parts of your question in terms of the additional concerns in this case, those are all perfectly appropriate concerns, and they all went in to the jury, and the jury heard all these facts. And in his judgment, the officer's actions were nonetheless reasonable, and that determination was certainly not against the manifest way. Well, there's a difference between overwhelming force, which is necessary, and excessive force. Overwhelming force is certainly appropriate, but... Certainly, when executing a high-risk search warrant, yes, it is, Your Honor, certainly. Well, there are two culprits here, one to one. I guess a shield went in first, is that correct? Correct. After the door was opened... Okay, how did he open the door? With a battery. I mean, that's pretty loud. It is. That makes a lot of racket, and I assume a lot of people inside, maybe they went right through right away. I don't know. We've seen several cases over the years where they use these rams, and some of them, they anticipate that and can't get through. Others, this may have been a door that just knocked over easily. I don't know. But whatever it is, that first battering ram, and then someone goes in with a shield, and then behind that person somebody lobs in the grenade. And, of course, he looks around and sees whatever he can see past the shield, I guess, and then lobs it in. And we don't know what the condition of the plaintiff was before she either rolled or something off of this mattress. I can't tell by the picture where she was, and we've seen it be shuffled around, and it's awful. It's a bad thing that happened. Certainly. I mean, the other cases, at least that I've seen, is that nobody was injured by one of these things. Now, it is true it has this congestion. It's supposed to be a surprise. It's supposed to cause everyone to be disarmed, or not disarmed, but as much as they don't know what to do, run around and stuff. So you get a fire superiority, we used to call it, in the military. That's a long time ago for me. But, in other words, that's how you get the element in there and it works. This one caused serious damage. It did. There's even only one of them. That's what it appears to be. And I can't tell how someone either falls. Maybe she rolled off this mattress with all the noise or something and didn't know where she was or something. Maybe she was inebriated or something. We don't know any of that. We believe that Ms. Fornoy rolled off of the air mattress, which, if I can try to describe the situation, is the officers were looking into the doorway. There was a wall to their right, and Ms. Fornoy was on an air mattress on the other side of that wall, to the right. After the door was opened and before the flashbang was deployed, or I'm sorry, after the flashbang was deployed, that's when Ms. Fornoy rolled off of the mattress and on top of the device. That was the sequence after the grenade went off? Yes, because Officer Quinn, who was the officer who deployed the device, testified that he examined the area inside the apartment where he deployed the device, and it was clear. There was no one there. And the windows were broken sort of concurrently with the grenade? Concurrently with the door being opened. The door, okay. So the door is scratched open, then the breaking glass. That generally would get anybody off a mattress, I think, whatever. One might imagine, correct. So we don't know. I think when we talk about the overriding statement of the jury, saying that it's a terrible thing, but they don't want to pin it on just those two guys because this was a command decision of some kind, and that, therefore, even though those are maybe the military, it might be the point man, people out in front that are doing the first shooting or whatever, as opposed to who makes the decision to have that plan of attack. And we don't know who did that. I believe he said that it was one of the plaintiffs, one of the defendants. Is that right? By the time the defendants, in this case, got involved in the search warrant, it had already been determined that this was a high-risk search warrant that merited the involvement of the SWAT team. Already determined what? That it was a high-risk search warrant and that it merited the involvement of the SWAT team. Okay. Was there somebody in charge of the SWAT team? Well, the two members of the SWAT team, the two sergeants who were supervisors. Okay. They're both members of this. Yes. Okay. Was one commanding it? I believe both were present for the execution of this warrant. I know, but there were 20 people. I'm just looking at it because the jury apparently assumed this was a command decision of some kind, and therefore they didn't want to pin it on just two guys. Is that your interpretation? What is your interpretation? The statement of the jury references errors of the Chicago Police Department as a whole. That's all we have in the record. Who were the original defendants in this case? Well, the city was originally a defendant through a Monell claim. One of the supervisors, I believe Sergeant Weiberg was also, or it might have been Sergeant Lamb, that's the name of the other supervisor in the case, was a named defendant. So at least one of these sergeants who was involved in approving the request for SWAT team services was a defendant. But all those defendants, except for Officers Colbinson and Quinn, were voluntarily dismissed before trial. The jury wasn't made aware that those were originally defendants, were they? No, Your Honor. But it doesn't take too much. You're just suing two low-level police officers and not the city, at least as far as this litigation is concerned. Yes, certainly. And there was no argument to the jury, was there, that someone directed Quinn to use the flashbang? No, there was no testimony along those lines. The jury saw the mission plan, which authorized the use of the flashbang grenade, and Officer Quinn was a member of the unit that was responsible for entering that front door. And his assignment within that team was to be the person to deploy the device if the coast was clear. And the mission plan said what about when to use a flashbang? In terms of the timing, it didn't specifically. . . Sorry, under what circumstances, not necessarily timing, but under what circumstances did the mission plan say it would be appropriate to use a flashbang? The mission plan didn't address that issue specifically. It authorized the use of them. And the officers testified about their training and in what situations they do or do not use these devices. So when you went to trial here, you didn't have the command people. You had the low-level officers who actually threw in the pipe. Correct, correct. And the jury didn't want to find them, apparently. According to that note, didn't want to stick this on their. . . Right, and that statement is perfectly reconcilable with the verdict in favor of these two individual officers. And that goes back to also my question is, there was no indication in any, or I'm sure we've heard of it, any indication that the city was originally a party, there may have been a settlement with regard to the city and so forth. None of that. There was no settlement with the city, correct. When they talk about a jury nullification, is that, you obviously would say that's not jury nullification. That is not jury nullification, Your Honor. The contents in the statement in the note is perfectly consistent with this verdict in favor of these two individual officers, in that the jury apparently determined that the Chicago Police Department as a whole made errors, but the jury wasn't asked to consider the conduct of the Chicago Police Department as a whole. It was only asked to consider whether these individual officers were personally responsible for what happened to Ms. Fornoy. And so whatever errors the department as a whole committed, that can't be attributed to these individual officers. And for these reasons, the judgment should be affirmed. Thank you. Thank you, counsel. Thanks to both counsel. And the case will be taken under advisement.